Salinas Valley Ice Company, Ltd. v. Commissioner. Monterey County Ice & Development Company v. Commissioner.
Salinas Valley Ice Co. v. Commissioner
Docket Nos. 106734, 106741.
United States Tax Court
1942 Tax Ct. Memo LEXIS 96; 1 T.C.M. (CCH) 84; T.C.M. (RIA) 42595; November 9, 1942
*96 E. W. Gottenberg, Esq., 515 Bank of America Bldg., San Jose, Calif., and L. T. Diebels, C.P.A., for the petitioners. Arthur L. Murray, Esq., for the respondent. ARNOLD Memorandum Findings of Fact and Opinion ARNOLD, J.: These consolidated proceedings involve deficiencies in income taxes for the year 1938 in the amount of $2,577.70 in Docket No. 106734 and $962.51 in Docket No. 106741. The petitioners filed their returns for 1938 with the collector of internal revenue for the first district of California. The question involved is whether each of the petitioners is entitled to an allowance for depreciation of certain assets claimed to have been purchased in 1938 by petitioners and others as tenants in common for use in their trade or business. Findings of Fact The petitioners, both California corporations, are, and in the taxable year were, engaged at Salinas, Monterey County, California, in the business of manufacturing and selling ice principally at wholesale to packers and shippers of lettuce and other vegetables. The petitioner, Salinas Valley Ice Company, Ltd., hereinafter referred to as Salinas Co., owned ice manufacturing plants, known as Soledad Street plant No. 1 and No. *97 2, Chualar Street plant and Gabilan Street plant. In addition to its ice business Salinas Co. in 1937 engaged in growing of lettuce and other vegetables on farms it owned and held under lease for shipment to eastern markets. It also owned packing sheds. In 1931 its ice plants erected prior to 1931 had a capacity of 286 tons daily. In 1931 it built the Chualar plant having a capacity of about 100 tons daily. This plant had a normal capacity of 25,000 tons a year. In 1936 it built the Gabilan plant having a capacity of 250 tons daily. In 1937 and 1938 the plants of Salinas Co. had an aggregate daily capacity of about 636 tons. In 1938 it had under lease the plant of Mountain Water Ice Company. The ice plant of the petitioner, Monterey County Ice & Development Company, hereinafter referred to as Monterey Co., prior to 1936 had a daily capacity of 150 tons. In 1936 it increased the capacity of its ice plant to 300 tons daily. There were other ice manufacturers in Salinas; the Union Ice Co., having a plant at the end of 1937 with a production capacity of 200 tons daily, the Growers Ice & Development Co., whose plant originally had a capacity of 150 tons daily which was increased in 1937 *98 to 300 tons daily, Mountain Water Ice Co., owned by Windsor Lewellyn, having a plant at the end of 1937 with a capacity of 150 tons daily, and Salinas Brewing & Ice Co. having a plant with a capacity of 150 tons daily. By the end of 1935 the production capacity of four plants then operating in Salinas aggregated 836 tons daily. In 1936 and 1937 the capacity, with the addition of two new concerns, was increased by approximately 900 tons daily. The Salinas Brewing & Ice Co., hereinafter referred to as Brewing Co., was and has been for many years engaged in the brewing of beer and also the manufacture of ice. In 1935 it produced 35,000 tons of ice; in 1936 33,000 tons; and in 1937 25,000 to 26,000 tons. In 1937 the Brewing Co. had two principal customers, one of them H. P. Garin, a grower and shipper of vegetables, then operating under receivership, purchased two-thirds to three-fourths of the ice manufactured by it. In 1938 it had a four year contract signed by Garin, acceptance of which by the Brewing Co. was withheld on account of pending negotiations for the sale of its ice plant. Based upon its previous experience the company expected to realize a profit of $20,000 in 1938 from *99 such contract. Its financial condition was not good. Its brewing business had not been operated in 1937 at a profit but its ice business was operated at a profit. It was indebted to the Monterey County Trust & Savings Bank to the extent of $60,000. The bank pressed for payment. The Brewing Co. made an application to the Reconstruction Finance Corporation for a loan which after some investigation was rejected, the president of the Brewing Co. being informed that the Corporation did not like to make a loan to a company in an industry which was overcrowded. A letter from the bank dated February 24, 1938, was received by the Brewing Co. suggesting the consummation of the sale of the ice plant at $150,000, and stating inter alia, as follows: We therefore, advise you that we shall expect you to liquidate your indebtedness to this bank in the event that such sale is not consummated. We shall expect such liquidation to be fully completed and the various obligations to us satisfied in full within thirty days from the date of the delivery to you of this letter. Under date of February 28, 1938, the Brewing Co., as party of the first part, entered into a written agreement with the petitioners *100 and Growers Ice & Development Co., a copartnership composed of Bruce Church, K. R. Nutting, E. E. Harden and T. R. Merrill, Union Ice Co., a corporation and Windsor Lewellyn, an individual doing business as Mountain Water Ice Co., as parties of the sixth part, wherein and whereby the Brewing Co. agreed to sell and the parties of the sixth part agreed to buy the "certain wholesale and retail ice business heretofore conducted by the party of the first part at the City of Salinas" together with certain equipment used in the production, manufacture and distribution of ice, and a large packing shed known as the "E. E. Harden Shed" located on the Southern Pacific Railroad Reservation, at Salinas, including any and all equipment located therein, excepting certain mentioned items, subject to an encumbrance in favor of E. E. Harden in the sum of $1,400, any and all equipment excepting all gravity rolls and desk contained in the "small packing shed", the small packing shed itself being reserved to the party of the first part, and an account known as "the H. P. Garin Company Account, and the H. P. Barin Receiver in Equity Account, excluding any sales tax thereon". The parties of the sixth part *101 agreed to pay for the "aforesaid business, equipment, and the Good Will thereof" the sum of $150,000, payable as follows: $30,000 on March 3, 1938 at noon; $25,000 on January 1, 1939; $20,000 on January 1, 1940; $15,000 on January 1, 1941; and $12,000 on each January 1 of 1942 to 1946, inclusive. The agreement further provides, inter alia, that at the request of the parties of the sixth part the party of the first part will, as long as the equipment is on its premises, manufacture ice to be used by the parties of the sixth part, for which party of the first part will receive the actual cost of such production, excluding therefrom any and all office supervision costs, plus ten percent upon the total cost price thereof; that the parties of the sixth part will remove all equipment purchased on or before the termination date of the payments to be made under the contract; and that the bill of sale evidencing the transfer to parties of the sixth part of the "Good Will and personal property" shall contain an agreement and covenant to the effect that the party of the first part will refrain from carrying on the manufacture, sale and distribution of ice, within the County of Monterey, *102 State of California, "as long as the parties of the sixth part, or any persons deriving title to the said Good Will from them, carries on a like business in said county". Under date of March 3, 1938 the Brewing Co. as party of the first part, executed a bill of sale transferring to the petitioners and the other parties named as parties of the sixth part in the agreement of sale of February 28, 1938, as parties of the second part, certain personal property and equipment described therein - Together with all of that wholesale and retail ice business heretofore conducted by the party of the first part in the city of Salinas, County of Monterey, State of California, together with the goodwill thereof, as provided for by Section 1674 of the Civil Code of the State of California, to the effect that the said party of the first part herein agrees with the said parties of the second part that it will refrain from carrying on a similar business, to wit, wholesale and retail ice business, within the County of Monterey, or any part thereof, as long as the said parties of the second part, or any persons deriving title to the said goodwill from said parties of the second part, carries on a like *103 business in said County of Monterey. The Brewing Co. also transferred by bill of sale under the same date to the same parties the shed known as the E. E. Harden shed, subject to an encumbrance of $1,400, together with certain equipment therein and certain equipment located in the small shed adjoining. The books of account of the Brewing Co. show the cost of the equipment sold and depreciation thereon to date of sale, as follows: Acquired
Asset
Cost
Depreciation
Balance
1926-1938
Ice plant & equipment
$109,592.84
$82,073.86
$27,518.98
1926-1931
Cooling tower
3,094.41
1,431.63
1,662.78
1937-1938
Reconditioning ice equipment
1,214.39
1,214.39
1931-1936
Packing shed equipment
9,201.96
4,871.28
4,330.68
1931-1936
Packing shed equipment
4,948.60
1,842.42
3,106.18
Total
$128,052.20
$90,219.19
$37,833.01
In March 1942 the Salinas Co. had an appraisal made of the equipment purchased from the Brewing Co. The appraisal was based on reproduction cost as of 1938, which cost was depreciated to determine its fair market value as of 1938. The prices used were obtained by the appraiser from manufacturers. The appraiser attempted to ascertain the dates of *104 the acquisition by the Brewing Co. of the various equipment but no one questioned seemed to know the exact time when the equipment was installed. In the letter attached to the appraisal report it is stated in part as follows: All values shown are based upon the reproduction value of the various items in 1938 and depreciations have been taken upon the condition of the property at that time. As the machinery has been operated very little since that date the present condition corresponds very closely with its condition at that time. The value of all the equipment as of 1938 was stated in the appraisal as follows: Reproduction cost - $100,865.70, Depreciation - $9,129.85, and "Sound Value" - $91,735.85. The appraisal includes no going concern value and no appraisal of the Harden shed. In 1931 or 1932 the Salinas Valley Ice Manufacturers Association, hereinafter referred to as the Association, was organized. Its purpose was the same as any trade association, including the development and maintenance of good will and cooperation among the ice manufacturers and the promotion of the ice business as well as vegetable growing. It did not regulate the price of ice. It did not attempt to limit *105 sales but it attempted to bring about the utilization of the entire production capacity of members and their storage facilities to the end that excess production capacity or surplus ice of one member would be available to fill the needs of a member with sales in excess of its production so as to avoid importation of ice from ice manufacturers outside of the Salinas Valley. In 1938 the Association had four members consisting of the petitioners, the Union Ice Co. and the Growers Ice & Development Co. The Monterey Co. issued its check dated March 2, 1938, in the amount of $4,110, being 13.7 percent of the first installment of $30,000 under the agreement of February 28, 1938, payable to the Monterey County Bank & Trust Company, which was endorsed to the credit of the account of the Brewing Co. The Salinas Co. issued its check dated March 3, 1938 in the amount of $12,510, being 41.7 percent of the first installment payable to the bank, which also bears a similar endorsement. The Brewing Co. ice plant was not operated in 1938 and was not operated until the year 1941 when it manufactured about 6,000 tons of ice. In 1938 the Soledad and Gabilan plants were not operated to full capacity *106 by Salinas Co. Its Chualar plant produced only 12,000 tons in that year. The plant of Mountain Water Ice Co., which was under lease to Salinas Co. was not operated in 1938. The Salinas Co. and the Monterey Co. deducted the amounts of $12,510 and $4,110 in their respective 1938 income tax returns under the item of "Other deductions authorized by law". In the return of Salinas Co. the amount paid by it was included in an item designated "Salinas Valley Ice Mfgrs. Assn.". The equipment was not included in the schedule of "FIXED ASSETS AND DEPRECIATION" attached to such return. In the return of Monterey Co. the item was included in an item designated as "Dues and assessments". The respondent disallowed the deductions. The assets purchased from the Brewing Co. by petitioners and others were not acquired for use in petitioners' trade or business. The purchase price of $150,000 was applicable to both depreciable and non-depreciable assets. Opinion The respondent determined that the amounts paid in 1938 represented the prorata share of each petitioner of the cost of eliminating competition in the Salinas area through the purchase of certain assets of the Brewing Co., and that, therefore, *107 such amounts were not deductible as ordinary and necessary business expense under section 23 (a) (1) of the Revenue Act of 1938, or any part thereof, as depreciation allowance under section 23 (1) of the Revenue Act of 1938. The petitioners do not now claim that the entire amount paid by each in 1938 is deductible as an ordinary and necessary business expense under section 23 (a) (1) or otherwise. The petitioners now claim that they are entitled to an allowance for depreciation or amortization of the tangible assets purchased by them and others from the Brewing Co. It is claimed that the Salinas Co. acquired a 41.7 percent undivided interest and the Monterey Co. acquired a 13.7 percent undivided interest in the property purchased; that the purchase price of $150,000 covered tangible property only which would have a residual value of $10,000 on January 1, 1946, the time when the equipment purchased is to be removed from the property of the Brewing Co.; that based upon a life of 94 months (March 1938 - December 1945, both inclusive) the depreciation sustained in 1938 for the ten months period was $14,893.60, of which amount the petitioners are entitled to deduct as depreciation their *108 respective shares of 41.7 percent and 13.7 percent, or $6,210.63 and $2,040.42. Section 23 (1) permits the deduction from gross income of a "reasonable allowance for exhaustion, wear and tear of property used in the trade or business". To be entitled to any allowance for depreciation the petitioners must prove not only the amount of the depreciation allowance but also that the property was used in the trade or business. The respondent determined that the plant was purchased to eliminate competition and not for use in the trade or business of petitioners. There is no evidence showing that petitioners set up on their respective books of account the interest acquired by them as depreciable assets and they did not take depreciation thereon in their returns. The ice plant was not operated in 1938. It was not operated until 1941 and then for about three months of that year beginning in August. The notices of deficiency were mailed to the petitioners on December 31, 1940. About 6,000 tons of ice were produced in 1941 whereas the capacity of the plant was 150 tons daily. It had produced as much as 35,000 tons a year. Whether the plant was operated after 1941 the evidence fails to show. *109 The evidence indicates that there was an over expansion in the ice manufacturing business in Salinas from 1935 to 1938 to such an extent that production to full capacity would have seriously affected the industry and might have resulted in a price war. The production capacity was doubled in Salinas from 1935 to 1938. The president of the Brewing Co. testified that its decrease in production from 1935 to 1937 was due to the expansion in production capacity in Salinas. In 1938 the Salinas Co. did not operate its Soledad plant and its Gabilan plant to full capacity. Its Chualar plant, which had a normal capacity of 25,000 tons a year, produced only 12,000 tons. The Mountain Water Ice Co., having a capacity of 150 tons daily, was under lease to Salinas Co. and was not operated during 1938. The Salinas Co. had apparently greater production capacity than its sales warranted. Its president testified that in 1939 the Brewing Co. plant was not operated because Growers Ice & Development Co. refused to take all the ice and petitioners had sufficient for their needs. He stated as a reason for the non-operation of the Brewing Co. plant in 1938 that a survey in 1938 of the acreage showed that with *110 a normal crop there would be more cars of vegetables shipped than before and hence a greater demand for ice but that there was a partial crop failure so that the ice demand for 1938 was less than in 1937 and the operation of the Brewing Co. plant was not required. However, the partial crop failure in 1938 alone does not sufficiently account for the non-operation of the Brewing Co. plant and the substantial limitation of production, as above pointed out. It appears from the record that the minute book of the Monterey Co. was examined by an internal revenue agent at the time he investigated the income tax return of that company for 1938, that, in compliance with an order, the minute book was produced at the hearing but upon examination thereof by the agent it was found that minutes of a meeting of the board of directors held February 16, 1938, was missing. The book was a looseleaf book. The agent testified that the book produced was the book he had examined and that at the time he examined it it contained the minutes of a meeting held on February 16, 1938, from which he made a memorandum and that the minutes showed that the president of the company stated at that meeting that "at present *111 there is a serious competitive situation due to overproduction" and the proposition to be considered is "whether or not it is more profitable to meet competition as it comes, or enter into an agreement and eliminate a part of the overproduction by closing down some plants." From the minutes of a meeting of the board of directors of the company held on March 7, 1938 it appears that the president stated that the "other members of the Association * * * had offered a plan whereby closing down the Mountain Water plant, as well as the brewery plant, this additional tonnage that they manufactured would fall to the Monterey County Ice and Development Co. plant", and he reported that a deal had been closed with the Brewing Co. for the purchase of its ice plant by the members of the Association for the sum of $150,000 payable during a period of nine years, of which amount Salinas Co. was to pay 41.7 percent and the Monterey Co. 13.7 percent. The agreement to purchase the Brewing Co. plant is dated February 28, 1938. In view of that evidence and the evidence showing that the Brewing Co. plant and the Mountain Water Ice Co. plant were not operated and production was reduced below normal in other *112 plants, it is reasonable to infer that the members of the Association and Mountain Water Ice Co., the plant of which was under lease to Salinas Co., decided to eliminate a part of the over-production by closing down some of the plants and that, therefore, the Brewing Co. plant was purchased for the purpose of closing down its production. Since its ice producing plant had been profitable, even though it had only one large account, the Brewing Co. would undoubtedly have continued the operation of its ice plant in 1938. To purchase the ice plant may have been the only way to close down its production. To prevail, the petitioners must show that the respondent erred in his determination that the Brewing Co. plant was purchased for the purpose of eliminating competition. This they have failed to do. The evidence in fact supports the respondent's determination. Good will or elimination of competition is not such a wasting asset as is subject to depreciation and no deduction for exhaustion or depreciation in that respect is allowable. (appeal pending C.C.A., 2nd Cir. * ); ; *113 ; , affirmed as . Cf. . The petitioners cite ; ; ; and , as authority for its right to a depreciation allowance in 1938, although the Brewing Co. plant was not operated. Those cases are distinguishable on the facts. In each of such cases it was found that although the property was not in use in the taxable year, it had been acquired and held for use in a business regularly carried on by the taxpayer. The evidence adduced herein fails to show that the Brewing Co. plant was acquired for use in the *114 business of the petitioners. Furthermore, under the agreements involved, the assets sold for the sum of $150,000 included not only certain tangible property consisting of the ice manufacturing equipment and a packing shed, but also good will, together with an agreement by the Brewing Co. to refrain from carrying on a similar business in Monterey County for an indefinite period of time. Although the agreement and the bill of sale specifically mention good will as one of the assets of the Brewing Co. being transferred, the president of the Salinas Co. testified that no value was allocated to any good will of the Brewing Co. in negotiating the deal because it had no contracts for the sale of ice and the manufacture of ice was merely incidental to its business of brewing beer, and that any business it had could have been solicited and probably acquired by any ice company operating in Salinas. The Salinas Co. had an appraisal made of the equipment and ice plant sold by the Brewing Co. in March, 1942. This was introduced in evidence by petitioners and the value of the equipment stated therein is in substantial variance with that testified to by the president of the Salinas Co. The appraisal *115 shows that the appraiser testified that he placed a value of $100,865.70 on such equipment based upon the replacement or reproduction cost as of 1938. The appraiser testified that the replacement costs used in the appraisal were prices prevailing in 1938 obtained from manufacturers. The purchase price was, therefore, approximately $50,000 in excess of the price at which new equipment could have been obtained in 1938. The appraisal itself refutes petitioners' contention that the tangible assets purchased had a fair market value of $150,000 when purchased. The fair market value of the equipment according to the appraisal was $91,735.85, or approximately $59,000 less than the purchase price. The net value or undepreciated cost of the equipment, including the shed, as shown by the books of the Brewing Co., is $37,833.01. The basis for depreciation of the tangible property is cost thereof to the petitioners. This is a question of fact. The burden is upon the petitioners to establish the amount of the deduction. ; . The petitioners purchased *116 both depreciable and non-depreciable assets. In our opinion the petitioners have not sustained their burden of proof in that they have likewise failed to adduce evidence from which the portion of the $150,000 properly allocable to the depreciable assets could be determined. Reproduction or replacement value may not be used as a basis for depreciation. ; , affirmed on this point . Nor would it be proper to use the value of the assets as shown by the books of the Brewing Co. The determination of the respondent must, therefore, be approved. Decisions will be entered for the respondent. Footnotes
*. , which affirmed and reversed in part BTA decision.↩